UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

FRANCISCO MALDONADO and BRIDGETTE
MALDONADO

                          Plaintiffs,   <u>ORDER</u>

        - against -            CV 2009-0018 (MDG)

HAPAG-LLOYD SHIPS, LTD., HAPAG-LLOYD
A.G., HAPAG-LLOYD CONTAINER LINE GMBH,
NEW YORK CONTAINER TERMINAL, INC.,
HOWLAND HOOK CONTAINER TERMINAL, INC.,
M/V NEW ORLEANS EXPRESS,

                          Defendants.

- - - - - - - - - - - - - - - - - -X

Plaintiffs Francisco and Bridgette Maldonado bring this action under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 <u>et</u> <u>seq.</u>, the general maritime law and New York state law seeking to recover damages for injuries sustained by Mr. Maldonado while working as a lasher aboard M/V New Orleans Express, a container ship. Compl. (ct. doc. 1), ¶ 10. Plaintiffs sued the owners of the vessel, defendants Hapag-Lloyd Ships, Ltd., Hapag-Lloyd A.G. and Hapag-Lloyd Container Line GmbH ("vessel defendants"); the vessel M/V New Orleans Express (<u>in</u> <u>rem</u>); and New York Container Terminal, Inc. ("NYCT") and Howland Hook Container Terminal, Inc. (collectively called "stevedore defendants"), which operated the terminal where the vessel was docked for unloading. After all parties consented to trial before me, <u>see</u> Consent to Jurisdiction (ct. doc. 25),

both sets of defendants moved for summary judgment to dismiss plaintiffs' complaint and the stevedore defendants also moved to dismiss counterclaims asserted against them by the vessel defendants.  See Stevedore Defs.' Summ. J. Mot. (ct. doc. 26); Vessel Defs.' Summ. J. Mot. (ct. doc. 27).

This Court granted the motion for summary judgment of the stevedore defendants in an order filed on March 31, 2015 ("Prior Order").  Ct. doc. 39.  As indicated at oral argument, the motion of the vessel defendants is denied.  This order further sets forth the reasons for the decision.

## PERTINENT FACTS

Except as otherwise indicated, the following facts are undisputed and if disputed, are resolved in favor of plaintiffs for purposes of this motion.

As discussed in the Prior Order, Mr. Maldonado was employed by the stevedore defendants as a lasher, whose duties included securing and unsecuring containers for loading and discharge from ships.  In the late evening of February 5, 2007, he was called by NYCT to join a crew of lashers and other NYCT workers to assist in loading and unloading of containers on and off the New Orleans Express.  The vessel had traveled from Southampton to New York, beginning its journey on January 27, 2007 and pulling into a berth at a NYCT terminal in Staten Island around 6:25 p.m. on February 5, 2007.  NYCT was scheduled to discharge 475 containers

and load 423 containers before the vessel departed the next morning at 7:00 a.m.  Ct. doc. 29, Exh. E (NYCT Vessel Recap Rept.); Ct. doc. 36, Exh. F (Report of Charles Cushing at 3).

During the voyage of the New Orleans Express to New York, the vessel's Electrical Officer Trilok Nath Bhardwaj conducted a daily inspection of refrigerated containers, which are commonly called "reefers," ordinarily inspecting the reefers twice a day to check that they were operating and maintaining correct temperatures.  Bhardwaj Dep. 58-59.  He would conduct the first inspection at around 9:00 a.m. and the second inspection in the afternoon between 4:00 p.m. and 5:00 p.m., after which he recorded results in his Daily Work Book.  Id.  Officer Bhardwaj also conducted inspections of socket boxes every three months on a quarterly basis in December, March and June.  Id. at 109.  On February 5, 2007, Officer Bhardwaj inspected all reefers on board once at approximately 9:00 a.m., including the containers stowed on deck at Bay 38.  He found them all to be in normal operating condition and so noted his observations in his Daily Work Book.  Id. 15, 58-61.

NYCT employees commenced cargo operations around 7:00 p.m.  See Vessel Recap Rept.  Assistant Lasher Foreman, Anibal Pitre, of the NYCT, acted as foreman and directed operations following an NYCT plan for the loading and offloading of both dry and refrigerated containers.  Pitre Dep. at 17-18.  Refrigerated containers are connected to an electrical power supply on a

vessel by means of an electrical cable hard wired to each
container.  Fallon Dep. 112.  The refrigerated containers on the
M/V New Orleans required a 440 volt power supply and each had an
attached three phase electrical cable with a standard 32 amp plug
that was approximately 50 to 60 feet long.  Bhardway Dep. at 102;
Cushing Rept.  "Reefer technicians," who were part of the NYCT
crew, had the responsibility of disconnecting reefers cables.
Trivedi Dep. at 5, 7-8.  They would board to unscrew plugs from
the sockets, and, upon completion of that task, would leave the
vessel to await a later call to plug in loaded reefers.  Trivedi
Dep. at 57-58; Fallon Dep. at 90, 120; Mustari Dep. at 34.

After loading and unloading operations had begun, Mr.
Maldonado was called to work and reported for duty around
midnight.  Maldonado Dep. at 206-07.  He continued working
through the early hours of February 6, 2007 until he was injured
in an accident around 4:40 a.m.  Approximately 20 minutes before
the accident, Mr. Maldonado and another lasher, Daniel
Wisniewski, were directed to Bay 38 to lash a reefer.  Maldonado
Dep. at 33-34, 134-37.

Earlier in operations, there had been three refrigerated
containers that had been unlashed and removed from Bay 38
sometime between 7:00 p.m. and 7:24 p.m. on February 5, 2007.
Fallon Dep. at 53.  Prior to unloading, there were 21 containers
in bay 38, 13 of them occupying the entire first tier of that
bay, with the remaining eight containers stacked at various

positions on the second tier. Cushing Rep. at 9. A total of 15 containers were removed from bay 38, leaving six dry containers in bay 38 stacked two high next to each other. Id. at 8-9. Around 4:06 to 4:24 a.m., fourteen containers were stowed in the bay, including three reefers, that were stacked two high, leaving positions 3, 4 and 6 unoccupied. Id. at 9-10.

Approximately ten minutes after Mr. Maldonado started working in Bay 38, cranes that provided lighting over that bay moved to a different part of the ship and he relied on his helmet light to see.[1] See Maldonado Dep. at 154-55, 157. At about 4:40 a.m., he went to lash containers at position 5 of bay 38 and reached to pick up a turnbuckle[2] lying on a hatch cover. Id. at 137-38, 141. As he grabbed the turnbuckle, he was shocked by a torn black cable that he had not seen earlier[3] that was touching

---

[1] The parties dispute the amount of lighting in bay 38. However, as discussed below, this dispute is not material to disposition of the issues here.

[2] A turnbuckle is a piece of equipment that is used to lash, or stow, cargo containers on a ship. See Maldonado Dep. at 20-21, 24-25. As defendants explain, lashing bars are used to secure containers and are held in place by turnbuckles that are tightened by lashers manually using a rebar. The only tools that Mr. Maldonado used as a lasher were "poles, two high or three high bar, and rebar to loosen the turnbuckle," items which are already on the ship. Id. at 21.

[3] For purposes of this motion, this Court credits Mr. Maldonado's testimony that he did not see the cable before touching the turnbuckle. Maldonado Dep. 157, 170, 210, 212. The Court is not persuaded, in light of Mr. Maldonado's other statments, by defendants' effort to construe the statement that he saw the cable as he grabbed the turnbuckle to mean that Mr. Maldonado had seen the cable before touching the turnbuckle.

-5-

or tangled around the turnbuckle. See id. at 157-58, 170. There was a very bright flash or spark and then a second spark. Id. at 173; Wisniewski Dep. at 122-25, 137.

Michael Govenara, also a longshoreman, quickly went to bay 38 after hearing that someone had been injured. Govenara Dep. at 43. When he arrived, he saw Mr. Maldonado lying on the ground. Id. at 45. He subsequently took pictures of the area, including pictures of the broken electrical cable submitted in connection with the instant motion. Id. at 102-104; see ct. doc. 36, Exh. N (photographs). Robert Mustari, Assistant Reefer Foreman at NYCT, who arrived at the ship approximately half an hour after the accident, did not see any frayed or broken cables. Mustari Dep. at 19-20.

For the reasons that follow, the motion for summary judgment of the vessel defendants is denied.

## DISCUSSION

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991) (citations omitted); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Golden Pacific Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004). The moving party

bears the initial burden of demonstrating an absence of material facts and once it has done so, the burden shifts to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether there is a genuine issue of material fact, the court must resolve ambiguities and draw inferences in favor of the non-moving party. Id.; Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

As both sides agree, the issues in this case are governed by the LHWCA and Mr. Maldonado, who was working as a stevedore aboard the New Orleans Express, is a "covered person" under this Act. Section 905(b) provides in pertinent part that:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party .... If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies

against the vessel except remedies available under this
Act.

Although the LHWCA does not define "negligence" for the purpose of actions against third-party vessel owners under § 905(b), courts have applied the federal common law standards articulated by the Supreme Court in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981) to "guide judicial determinations of liability under this subsection." O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 64-65 (2d Cir. 2002) (citing Scindia, 451 U.S. at 165-78). In Scindia, the Supreme Court articulated three duties owed by a shipowner to a longshoremen, which it later refined in Howlett v. Birkdale Shipping Co., 512 U.S. 92, 97 (1994). See Giganti v. Polsteam Shipping Co., 997 F. Supp. 2d 182, 191 (E.D.N.Y. 2013). The three Scindia duties are (1) the "turnover duty;" (2) the "active control duty;" and (3) the "duty to intervene." O'Hara, 294 F.3d at 64.

The turnover duty has two components: "a primary duty to take ordinary care' and a corollary 'duty to warn.'" Gigante, 997 F. Supp. 2d at 192 (citations omitted). The primary duty of the vessel owner is the duty to turn the ship over to the stevedoring company "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter ... will be able by the exercise of ordinary care" to carry out his operations with reasonable safety. Id. (citing Howlett, 512 U.S. at 98). The vessel owner is also charged with the corollary duty to warn the

stevedore of any hazardous conditions on the ship that are "known to the vessel or should be known to it in the exercise of reasonable care, that would be likely encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." Howlett, 512 U.S. at 99. Although the vessel owner is required to turn the ship over to the stevedoring company in a reasonably safe condition, the vessel owner is not charged with turning over to the stevedore an "absolutely safe vessel." Sinagra v. Atl. Ocean Shipping, 182 F. Supp. 2d 294, 300 (E.D.N.Y. 2001). Nor does the duty to warn of latent hazards obligate the vessel owner to inspect the ship and cargo before turning the ship over to the stevedore for cargo operations "because any defect obvious enough for the vessel owner to detect would be discovered by a competent stevedore." Verga v. Rotterdam Exp, 2009 WL 4363444, at *4 (E.D.N.Y. 2009) (citing Fernandez v. China Ocean Shipping, (Group) Co., 312 F. Supp. 2d 369, 375 (E.D.N.Y. 2003)).

Second, once stevedoring operations have begun, a vessel owner may be liable "if it actively involves itself in cargo operations and negligently injures a longshoreman." Scindia, 451 U.S. at 157. Although a vessel owner has no ongoing duty to supervise or inspect the stevedore's work - absent contractual, regulatory or customary obligations to the contrary, ... it may be liable 'if it fails to exercise due care to avoid exposing

longshoremen to harm from hazards they may encounter in areas, or from equipment, under the *active control of the vessel* during the stevedoring operation.'" Gravatt v. City of New York, 226 F.3d 108, 121 (2d Cir. 2000) (citing Scindia, 451 U.S. at 167) (emphasis added). "Therefore, the vessel must take care to prevent unreasonable hazards in areas of the vessel under its direct control." Id.

Notwithstanding the limited duty imposed on vessel owners after operations begin, a third duty to intervene arises "[w]ith respect to obvious dangers in areas under the principal control of the stevedore," if the owner "acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore [or other contractor] is not exercising reasonable care to protect its employees from that risk. Id. (citing Scindia, 451 U.S. at 175-76).

Defendants argue that the plaintiffs cannot show a breach of their "turnover duty" since the accident occurred over nine and a half hours after the turnover at 7:00 p.m. on February 5, 2007 and that the conditions leading to the accident had existed for a sufficiently long time for defendants to discover. Specifically, they contend there is no evidence of any defective or broken electrical cable at the time of turnover. Besides noting the absence of any testimony from someone who had observed a broken cable on the vessel that day, they also point to the fact that

Officer Bhardwaj had found at his inspection at 9:00 a.m. that all reefer containers on the vessel were operating properly. They argue that had any cable been cut or torn, there would have been an indication of power problems to a reefer. They further argue that the most likely cause of the broken cable was the failure of the reefer technicians to unplug a reefer container in bay 38 prior to discharge from the vessel and the cable broke as the container was lifted from bay 38.

However, on the record presented and drawing all inferences in favor of the plaintiffs, this Court cannot agree entirely with the defendants' reasoning. The crux of the dispute here is how and when a live cable ended up at the location where Mr. Maldonado received a shock in bay 38. While defendants' theory that the broken cable was the remaining fragment of a reefer cable that had not been unplugged certainly provides a plausible explanation for what happened, their attempt to rule out other explanations rest on disputed or insufficient facts and are insufficient to establish as a matter of law that they did not breach their turnover duty.

As a preliminary matter, it is clear that the electrical cables attached to reefer containers do get damaged and broken under circumstances not stemming from a failure to unplug a cable. As Thomas Fallon, Vice President of Maintenance and Repair of NYCT testified, he was aware of instances when reefer technicians would encounter torn cables after first boarding a

vessel, and, presumably, prior to the unloading of a reefer container. Fallon Dep. at 50. Also, reefer technicians would sometimes find, in the course of unplugging containers, broken and frayed cables and, in such instances, actually make repairs to the cable. Mustari Dep. at 36-37. On the other hand, there were no work orders indicating that a reefer technician had found any defective reefer cable and made repairs on board the New Orleans Express on February 5 or 6, 2007. Id. at 38. Nor has there been any evidence presented that anyone on the New Orleans Express had reported, let alone observed, any broken or frayed cable prior to Mr. Maldonado's accident. Fallon Dep. at 50-51. However, the evidence presented is sufficient to raise an issue whether there was a broken cable before the three reefer containers and other containers were removed from bay 38. While not itself a basis to find breach of the turnover duty, a number of people testified to the poor housekeeping practices on the vessel, increasing the likelihood that a live electrical cord could be hidden around a metallic piece of equipment prior to turnover.

Moreover, there are issues of fact whether the broken live cable was caused by the removal of a reefer container without having first been unplugged. Mr. Mustari testified that all the reefer technicians working that day were experienced and were not likely to forget to unplug a reefer container from the socket. Mustari Dep. at 40-41. In addition, Mr. Pitre testified that in

his experience, when a reefer container that was not unplugged is lifted off a vessel, the plug would either be pulled out of the socket or the entire socket would be lifted up with the cable. Pitre Dep. at 47.

Defendants support their theory with the report of their expert, Charles Cushner, that the broken cable was a reefer cable that was still plugged into the socket when the container to which it was attached was lifted off the vessel. Mr. Cushner based this opinion, in part, on the picture of the torn cable which showed that the conductors in the insulated cable were of uneven lengths resulting from the cable breaking at different parts because the components were materials of different tensile strength. However, this opinion is disputed. Mr. Pitre stated that the cable in the photographs appeared to be a torn extension cord which was probably left over from a prior voyage. Pitre Dep. at 196-97, 210. Mr. Fallon testified that the wires appear to have been the result of a "burn back." Fallon Dep. at 121-22. Although Mr. Cushing criticizes Mr. Fallon for basing his opinion on photographs that are not clear and detailed, he, too, relies on the photographs to support his opinion.

Defendants attempt to buttress their theory by pointing to NYCT invoices evidencing that the vessel had been billed for repairs to three cables. However, as Mr. Fallon explained, the invoices did not indicate that any of the work involved the replacement of missing plugs nor was there any mention of a

broken reefer cable.  Fallon Dep. at 110-115.  Had such work been performed, the invoice would have indicated that a plug had been installed.  Id. at 115.

Plaintiff's expert, Arthur Archibald, opines that had the cable been broken when the container was lifted while still plugged in the socket, the cable most likely would have struck a metal object that should have resulted in a short circuit that would trip a circuit breaker.[4]  Ct. doc. 33-3.  Setting aside defendants' criticism of Mr. Archibald's further opinion that the vessel must have had defective "no fuse breakers" because the cable remained live, Mr. Archibald's underlying opinion that the falling broken cable was likely to have contacted a metal object is not unreasonable, particularly in the context of a summary judgment motion.  If the defendants are correct that the "no fuse breakers" were not defective, then a reasonable jury could conclude in light of the evidence that the live cable was not the remnant of torn cable from a removed container that had not been unplugged, given the likelihood that any falling cable should have tripped the circuit breaker.

Given the conflicting expert and lay expert opinions and defendants' reliance on their expert without raising a Daubert challenge to any of plaintiffs' evidence, summary judgment is not

---

[4] In contrast, Officer Bhardwaj testified that a broken line that remains plugged into the socket would not likely trip a circuit breaker because there would be no shorting between lines. Bhardwaj Dep. at 48-49.  Nor would there be any signal or alarm to indicate that a line had been cut.  Id. at 49.

appropriate here.  See Quiles v. City of New York, 978 F. Supp. 2d 374, 385 (S.D.N.Y. 2013) (plaintiff's testimony and expert report "plainly suffice to create a material factual issue as to whether the City negligently created a situation in which Quiles had to disembark" under the conditions present); see also Thomas v. Newton Int'l Entrps., 42 F.3d 1266, 1270 (9th Cir. 1994) (relying on expert opinion in finding genuine issue of material fact on whether unguarded hatch created unreasonably dangerous condition).  Suffice to say, had the broken cable been present prior to unloading of bay 38 and laid hidden until discharge of the 21 containers in the bay, a jury could find that it was not an obvious hazard given defendants's housekeeping practices and the fact the cord was black, instead of yellow, and not easily seen in dark conditions, and the placement of the cord vis a vis the turnbuckle.

Relatedly, the parties hotly contest whether the cable at issue was a reefer cable or an extension cord.  To be sure, if plaintiffs could definitively establish that the cable was an extension cord, defendants' positions would be seriously compromised.  As Officer Bhardwaj testified, extension cords were normally used.  Bhardwaj Dep. at 92.  While this Court agrees with defendants that Mr. Maldonado clearly called the cable a reefer cord and may have impermissibly attempted to contradict his prior testimony by presenting his affidavit, this decision does not rest on acceptance of his affidavit.  From review of the

-15-

testimony of witnesses and some of the incident reports, this Court notes that the testifying witnesses and persons writing reports sometimes were not precise or consistent in referring to the electrical cables.

On the other hand, this Court finds meritless plaintiffs' contention that poor lighting conditions of the vessel constituted a breach of the turnover duty. Plaintiffs argue that the lighting conditions impeded his ability to see the broken cord, which was particularly hard to see in the dark because the cord was black rather yellow, the typical color for reefer cords. However, it is undisputed that the cranes providing lighting were operated by the NYCT. Vitacco Dep. 71. Also, this Court agrees with defendants that Mr. Maldonado's belated attempt to argue in his opposing affidavit that he could not see the cord because of poor lighting contradicts his prior testimony and should be rejected. See Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) (rejecting a party's effort to create an issue of fact by presenting an affidavit contradicting his own prior testimony). Finally, setting aside any dispute over the extent of lighting provided, virtually every NYCT worker testified to working under different lighting conditions, including the conditions on the New Orleans Express on February 6, 2015. See Rios Dep. at 52 (did not use helmet light in bay 38); Vitacco Dep. at 53 (sufficient lighting); Governara Dep. at 103-04 (did not use helmet light); Pitre Dep. at 213 (lighting from pier).

The lighting conditions, whatever they may have been, were apparent to the workers and did not constitute a "hazard[] that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." Howlette, 512 U.S. at 99. Thus, this Court grants defendants summary judgment as to this aspect of the turnover duty.

Defendants also argue that they did not breach the duty of active involvement since control over the work area had turned over to the stevedore. This Court agrees and grants defendants summary judgment on this issue as well. There is absolutely no evidence that there were any vessel employees actively involved in any aspect of cargo operations prior to the accident. See Mustari Dep. at 147 (did not see any person other than lashers in the vicinity of bay 38 prior to the accident).

For similar reasons, this Court finds no duty to intervene. Under Scindia, a vessel has the duty to intervene "if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk." Gravatt, 226 F.3d at 121. "'Should-have-known' constructive knowledge is insufficient to meet the actual knowledge requirement." Id. at 127 n.17; see DeBiase v. Cat Island Shipping, Ltd., 2009 WL 3077193, at *10-*11 (E.D.N.Y. 2009) (granting summary judgment on duty to intervene for lack of evidence that defendants were aware of malfunctioning twist

lock); Sinagra v. Atl. Ocean Shipping, Ltd., 182 F. Supp. 2d 294, 305 (E.D.N.Y. 2001) (granting summary judgment where no evidence to attribute actual knowledge of danger).

Plaintiffs argue that the vessel defendants "must have known" of the dangerous condition created by the live wires because of testimony that the vessel's watch officer and his deck officers were present on the deck monitoring the cargo operations. See Pl.'s Mem. at 14-16. However, there is no evidence of the vessel's actual knowledge of the danger posed by the live wires or even evidence upon which the Court could infer actual knowledge despite the vessel's officers' presence on the deck. See Verga, 2009 WL 4363444, at *4-*5 (granting defendants' motion for summary judgment because no evidence of actual knowledge of grease condition even though vessel's crew was onboard and walking around deck); see also Casaceli v. Martech Int'l, Inc., 774 F.2d 1322, 1330 (5th Cir. 1985) ("mere presence of the vessel's crew on the ship . . . does not prove knowledge of the hazardous condition"). Until the accident, no NYCT employee was aware of any defective cable during the operation nor was any problem reported to the defendants. See Mustari Dep. at 38 (not aware of reefer technician needing to fix any cable); Pitre Dep. at 95 (no notice during the unloading of cargo of frayed wires); Fallen Dep. at 50. Second Officer Nitin Kulshrestha's testimony that crew members were walking through the catwalk areas and "propping between the bays," (see

Kulshrestha Dep. 24, 26), does not establish that crew members actually walked near the site of Mr. Maldonado's accident or observed the live wire.  Likewise, there is no evidence that the vessel had actual knowledge that the stevedoring company was not exercising reasonable care to protect its own employees from risk.  Absent actual knowledge of the dangerous condition, the vessel defendants did not have a duty to intervene.  Plaintiffs have not carried their burden of demonstrating sufficient facts to warrant a trial on this issue.  Accordingly, the vessel defendants are entitled to summary judgment on the duty to intervene.

## CONCLUSION

For the foregoing reasons, the vessel defendants' motion for summary judgment is denied in part and granted in part.

**SO ORDERED.**

Dated:     Brooklyn, New York
           May 1, 2015

                                    _/s/_____
                                    MARILYN DOLAN GO
                                    UNITED STATES MAGISTRATE JUDGE